NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

14-1078 consolidated with 14-1080

STATE IN THE INTEREST OF D.A., ET AL.

Consolidated with

STATE IN THE INTEREST OF K.A.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NOS. 26340 and 24681
HONORABLE GUY E. BRADBERRY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**BILLY HOWARD EZELL**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, Billy Howard Ezell, and James T. Genovese,
Judges.

**AFFIRMED.**

**Thomas W. Sanders  Jr.**
**1919 Kirkman St.**
**Lake Charles, LA 70601**
**(337) 491-2067**
**COUNSEL FOR APPELLEE:**
 **State of Louisiana, Department of Children and Family Services**

**Emily Wagner**
**934 Garden Drive**
**Westlake, LA 70669**
**(337) 661-9877**
**COUNSEL FOR APPELLANT:**
 **R. A. (mother)**

**Leslie M. Petty**
**One Lakeshore Dr., Suite 1585**
**Lake Charles, LA 70629**
**(337) 491-2461**
**COUNSEL FOR APPELLEE:**
 **K. A. (child)**

**Laketha Holmes**
**901 Lakeshore Dr., 8th Floor**
**Lake Charles, LA 70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
 **State of Louisiana, Department of Children and Family Services**

**EZELL, Judge.**

R.A. appeals the judgment of the trial court terminating her parental rights of her daughter. For the following reasons, we affirm the judgment of the trial court.

**FACTS**

On March 5, 2012, D.A., a seventeen-year-old son, C.A., a fourteen-year-old son, and K.A., a five-year-old daughter, were removed from their mother's home and placed in the custody of the State of Louisiana, Department of Children and Family Services (DCFS).[1] Initially, the DCFS received a report of physical abuse and a danger of threatened harm while K.A. was present in the home. An investigation by the DCFS revealed that the mother and her live-in boyfriend, J.M., were engaged in a physical altercation on February 29, 2012, which involved the mother throwing furniture without regard for the presence of K.A. The altercation started when D.A. wanted to borrow the truck, and the boyfriend would not let him. D.A., the mother, and the boyfriend then got into an argument. As the argument escalated, it got physical, and furniture was thrown. Eventually, the fight moved outside, and the mother's boyfriend ran into her with the truck. The investigation revealed that physical fighting was a regular occurrence in the home.

At the time of this particular fight, C.A. was not at home because he was living with his grandmother. The mother previously kicked C.A. out of the home when he would not wake up for school one morning. The investigation further revealed that the mother often drank beer and smoked marijuana in the house.

C.A. and K.A. were adjudicated children in need of care by a signed judgment on June 1, 2012. The children's father lived outside Louisiana and

---

[1] The present case only involves K.A. During the proceedings, D.A. reached the age of majority and was killed in an automobile accident. C.A. was about to turn eighteen years old when the termination of parental rights proceeding was initiated, so he was not included in that proceeding.

refused to return due to outstanding warrants for child support.[2] At the mother's suggestion, K.A. was placed with the mother's brother and wife, who lived in close proximity. Following the adjudication of the children in need of care, a case plan seeking reunification with the parents was implemented by the DCFS.

On March 31, 2014, the DCFS filed a petition to terminate the mother's parental rights regarding K.A., seeking her certification for adoption. A hearing was held on June 9, 2014. Finding it in the best interest of the child, the trial court terminated the parental rights of both her mother and father, freeing the child for adoption. Judgment was signed July 17, 2014. The mother then filed the present appeal. She also filed a motion for new trial which was denied by the trial court on November 19, 2014.

The mother has raised several assignments of error on appeal regarding both the 2012 judgment adjudicating the children in need of care and the 2014 judgment terminating her parental rights as to her daughter. The DCFS claims that this court lacks jurisdiction to entertain any errors regarding the judgment adjudicating the children in need of care because a timely appeal from that judgment was not filed. Therefore, we will address this issue first.

## 2012 ADUJUDICATION AS CHILDREN IN NEED OF CARE

Louisiana Children's Code Article 330 provides that an appeal may be taken from a judgment of disposition in children in need of care proceedings. Appeals are to be taken within fifteen days from the mailing of notice of the judgment. La.Ch.Code art. 332(A).

---

[2] The father never participated in any of the proceedings in the trial court and has not appealed the termination of his parental rights.

A judgment adjudicating the children in need of care was signed on June 1, 2012. Notice was personally served on the mother's attorney on June 11, 2012. No appeal was taken at that time. The present appeal was not filed until July 29, 2014, two years later. Furthermore, the motion for appeal clearly stated that the mother was appealing the judgment signed on July 17, 2014. No mention was made of the 2012 judgment.

An appellate court lacks appellate jurisdiction to address issues regarding a judgment which has not been timely appealed. *State ex rel. C.P.*, 00-2703 (La. 1/17/01), 777 So.2d 470; *State ex rel. E.A.*, 02-996 (La. App. 3 Cir. 10/2/02), 827 So.2d 594. In the instant case, the judgment adjudicating the children in need of care was not timely appealed and, thus, is not before us. Therefore, we will not address any issues regarding the adjudication of the children in need of care.

## CONTINUANCE

On the day of trial, the mother's court-appointed attorney requested a continuance so that the attorney she recently employed could prepare for trial. The trial court denied the motion. On appeal, the mother claims that her right to a fair trial was prejudiced when the trial court failed to grant her continuance because her court-appointed attorney was not prepared because he believed that the continuance would be granted.

While a continuance may be granted when there is a good reason, the decision to grant a continuance is discretionary. La.Code Civ.P. art. 1601. The trial court's decision to deny a continuance will not be disturbed on appeal unless the trial court abused its discretion. *Ardoin v. Bourgeois*, 04-1663 (La. App. 3 Cir. 11/2/05), 916 So.2d 329. The particular facts of each case must be considered in deciding whether to grant or deny a continuance. *Id*. "Some factors to consider

are diligence, good faith, and reasonable grounds." *Id.* at 332. "Fairness to both parties and the need for orderly administration of justice are additional considerations in deciding whether to grant or deny a continuance." *Id.*

The termination hearing occurred two years after the children were adjudicated in need of care. Once the termination proceeding was initiated, the mother had three months to hire an attorney, but choose not to inform the court that she had hired an attorney until the day of the hearing. At that point, the witnesses were in court and ready to proceed. The mother's attorney examined each witness on her behalf. The mother herself testified. She was represented during the entire proceedings. We find no manifest error in the trial court's decision to deny the mother's request for a continuance.

## TERMINATION OF PARENTAL RIGHTS

Two private interests are involved in every involuntary termination of parental rights: the interests of the parents and the interests of the child. *State ex rel. H.A.B.*, 10-1111 (La. 10/19/10), 49 So.3d 345. As for the parents, they have a natural, fundamental liberty interest, which is more significant than any property interest, to the continuing companionship, care, custody and management of their children. *Id.* This significant liberty interest does not cease to exist simply because parents have not been role models or their children have been adjudicated in need of care. *Id.*

As for the children, their interests are often at odds with parents' interests, because they have a right to secure, stable, long-term, and continuous relationships found in a home with proper parental care which often means terminating parental rights that prevent adoption. *Id.* Courts have determined that the countervailing interests of children are superior and paramount to the parents' interests. *Id.*

4

Furthermore, La.Ch.Code art. 1001 provides that "[i]n all proceedings, the primary concern is to secure the best interest of the child if a ground justifying termination of parental rights is proved."

> The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child.

*State ex rel. J.A.*, 99-2905, p. 8 (La. 1/12/00), 752 So.2d 806, 811.

Louisiana Children's Code Article 1015 provides the grounds for involuntary termination of parental rights. "In order to terminate rights, the court must find the State has established at least one of the statutory grounds contained in its provisions by clear and convincing evidence." *State ex rel. H.A.B.*, 49 So.3d at 368. "[E]ven upon finding the State has met its evidentiary burden, a court still should not terminate parental rights unless it determines to do so is in the child's best interest." *Id*. The manifest error standard of review applies to a trial court's determination that an involuntary termination of parental rights is warranted. *Id*.; *In re TMS*, 08-810 (La.App. 3 Cir. 11/5/08), 999 So.2d 21.

The mother argues that the trial court erred in terminating her parental rights because the weight of the evidence did not meet the criteria of La.Ch.Code art. 1015. The trial court found that the mother had failed to provide significant contributions to the care and support of the child as contemplated by La.Ch.Code art. 1015(4)(b). The trial court further determined that the mother had not substantially complied with her case plan as set forth by La.Ch.Code art. 1015(5).

**Significant Contributions to Child's Care**

Louisiana Children's Code Article 1015(4)(b) provides that termination is appropriate due to a parent demonstrating the intention of avoiding parental responsibility when "[a]s of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months." As part of the case plan, the mother was responsible for paying $25.00 monthly for each child. Eventually, the amount was changed to a total of $63.00 a month.

The mother secured employment at a Dollar General store in her area. Her wages were garnished for the child support payments. However, the mother became unemployed in November 2013. At trial, she testified that her unemployment was due to the fact that she had to miss work in order to make the necessary appointments and meetings required by the case plan. She admitted that she was behind over $1,000.00 ($1,023.23 to be exact) from November 2013 until March 2014, when the petition to terminate parental rights was filed. This amount represents well over six months of obligations required for termination of parental rights pursuant to La.Ch.Code art. 1015(4)(b).

The mother finally secured employment again in April 2014 with Candlewood Suites in Sulphur, after the petition for termination of parental rights was served. However, she offered no testimony or evidence that she had started making child support payments again.

The mother testified that she did buy items for her daughter, including a bike and other gifts. However, "gift-giving does not amount to significant support." *In re TMS*, 999 So.2d at 26. We find no manifest error in the trial court's conclusion that the mother did not provide adequate support as required by the case plan.

**Substantial Compliance With Case Plan**

The mother argues that the trial court erred in determining that she had not complied with the case plan submitted by the DCFS.  Louisiana Children's Code Article 1015(5) provides:

> Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Pursuant to La.Ch.Code art. 1036(C) and (D), lack of compliance with a case plan and lack of any reasonable expectation of significant improvement in the parent's conduct in the future may be established as follows:

> C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
> (1) The parent's failure to attend court-approved scheduled visitations with the child.
> (2) The parent's failure to communicate with the child.
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
> (5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
> (6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
> (7) The persistence of conditions that led to removal or similar potentially harmful conditions.

7

D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

In finding the mother did not substantially comply with her case plan, the trial court in its written reasons stated that, "The mother has often resisted improvement in those areas where improvement was necessary if reunification was to be accomplished. When the mother did participate in case plan goals, she later disregarded that which she should have learned as a result of said participation."

Reviewing the record and testimony, it is apparent to this court that the mother went through the motions of the case plan initially. However, the record indicates that she slacked toward the end and, as pointed out by the trial court, failed to implement the tools that had been provided for her in order to provide a better home environment for her daughter.

The case plan required that the mother attend twenty-four domestic violence classes. At the time of the hearing, she still had five classes to complete. The mother also failed to complete the mental health requirements. During the course of seeing Kendall Lejeune for counseling, the mother just quit going because she decided she did not need counseling. She eventually did go back to see Mr.

8

Lejeune but only after she was reminded of her case plan obligations by the DCFS case worker.

Initially, the mother was allowed unsupervised visitation with her daughter. However, the mother constantly exposed herself to situations that subjected her to potential domestic violence, the reason the children were removed from her home. She allowed her oldest son and girlfriend to live in the house with her. Even though she was supposed to notify the DCFS of anyone eighteen years or older in the home, she never told them about her son living there. While the son was living at home, R.A. and her son got into a disagreement in which the son was injured and the home was damaged. Her son then moved out. However, her son and girlfriend later moved back into the home. Again, the mother did not inform the DCFS of her oldest son's presence in her home. At this time, unsupervised visits between R.A. and her daughter were suspended.

In January 2013, police were called when R.A. attacked her oldest son's pregnant girlfriend, who was a juvenile at the time. This incident occurred after the mother and girlfriend dropped the son off at work. In June 2013, R.A. was involved in another altercation with her oldest son, who was reportedly living in the home. Her son struck her in the face causing bruising to the right side of her face.

After removal of her daughter from the home, Tiffany Etienne, the case worker, would visit the mother at her home. When Ms. Etienne was leaving on one visit, she noticed R.A's live-in boyfriend, J.M., getting dropped off at the house. Supposedly, he was no longer living with R.A. Ms. Etienne went back to the home and discovered the boyfriend walking around shirtless with jeans. Ms. Etienne testified that it appeared to her that he lived in the home. R.A. testified

that the boyfriend would just pop in to get her in trouble. As late as September 2013, the boyfriend was seen at the home. In November 2013, the boyfriend broke into R.A.'s home and started hitting her. After this incident, he was arrested.

R.A.'s inability to provide a stable environment for her child is also exhibited by the fact that she has not had a consistent housing situation. Even though the mother owns her own home, she testified that she moved in with her brother around May 2013. However, it appears it had to be after the November 2013 incident, because she was still living at home when her boyfriend broke into her home. Subsequently, R.A. moved in with her sister sometime in January 2014. Finally, she moved into an apartment in Sulphur with a gentleman on May 29, 2014. The two of them agreed to split the rent on the three-bedroom apartment. However, R.A. has failed to secure a background check on this gentleman as required by the case plan.

Another part of R.A.'s case plan required her to secure employment. After her employment with the Dollar General store ended in November 2013, R.A. did not secure employment until encouraged by Ms. Etienne to do so.

Although R.A. tested negative on all the drug tests, she admitted to finding marijuana while cleaning a hotel room at her new job and smoking it while living with her sister. She testified that she "felt like that maybe God told [her] to."

Even though the mother recommended that her daughter live with her brother and sister-in-law, she would speak poorly of them to her daughter. She also spoke poorly of the DCFS to her daughter. She was warned that part of her case plan involved not speaking in a negative manner to her child about the situation. R.A. testified that the negativity came from her daughter's and caretaker's own minds and nothing she did.

Sheryl Royer, a licensed clinical social worker, was appointed to provide individual therapy for her daughter as of October 2013. K.A. had been with foster parents for over a year when Ms. Royer first met her. In her report of March 7, 2014, Ms. Royer found K.A. to be happy at her foster home, but realized her loyalties were divided between her mother and her foster parents. Ms. Royer observed that since K.A. realizes she may not return to her mother's home, "she seems happier and more settled, as if she is assured that the decisions regarding her future are made[,] and she can move on with her life." At trial, Ms. Royer testified that the mother was not satisfied with her daughter's placement with her brother and sister-in-law and would rather see her daughter in a foster home.

Ms. Royer also testified that R.A. told her that she had been diagnosed with bipolar disorder but was not taking medication due to the way it made her feel and that she could not afford it. Ms. Royer was concerned about the mother's ability to care for her daughter if the mother did not get treatment for her mental issues. Ms. Royer was concerned that R.A. put her own needs ahead of her child.

Ms. Royer concluded that it is in K.A's best interest to have her future settled permanently. She was in agreement with the goal change to adoption, freeing K.A. for adoption by her uncle and aunt. Ms. Royer did state that it is important that K.A. have some continued contact with her mother over the years.

At the beginning of the case, a CASA volunteer was assigned to the case. After visiting with K.A., her mother, and the uncle and aunt on several occasions, it was also the CASA volunteer's recommendation that K.A. remain with her uncle and aunt. She also recommended adoption for K.A.

After reviewing the evidence in the record, we find no manifest error in the trial court's decision to terminate R.A's parental rights to K.A. Her daughter is

thriving and happy in her new environment. While the mother has tried to follow the requirements of the case plan, she continued to surround herself with people who take advantage of her, even though she knows this is why her daughter was removed in the first place. She only seems to be going through the motions of attending classes and getting help when she is pushed by the case workers. Under the circumstances of this case, it is in the best interest of K.A. that her mother's parental rights be terminated. K.A. is in a good environment and has the opportunity at a more secure and stable life.

The judgment of the trial court terminating R.A.'s parental rights is affirmed. Costs are assessed to R.A.

**AFFIRMED.**

This opinion is NOT DESGINATED FOR PUBLICATION. Uniform Rules-Courts of Appeal, Rule 2-16.3